UNITED STATES DISTRICT COURT
for the
Southern District of Indiana

Case No. 4:18-CV-10

| | | |
|---|---|---|
| F & J APARTMENTS, LLC; BROWN RENTAL PROPERTIES, LLC; COOLEY PROPERTY MANAGEMENT, LLC; GREGORY DEVELOPMENT, LLC; JOSH GREGORY; GREG YEAGER; KENNETH T. WESTMORELAND, JR. and MICHELLE R. WESTMORELAND; MATTHEW SHULTZ; LISA SHULTZ; and DALE MAY | ) ) ) ) ) ) ) ) | PLAINTIFFS |
| v. | ) ) | |
| G. ROBERT HALL, Individually and in his Official Capacity as Mayor of the City of Charlestown, Indiana; M. ANTHONY JACKSON, Individually and in his Official Capacity as Building Commissioner for the City of Charlestown, Indiana; ERIC VAUGHN, Individually and as a Member of the Charlestown City Council; TED LITTLE, Individually and as a Member of the Charlestown City Council; MIKE VAUGHN, Individually and as a Member of the Charlestown City Council; BRIAN HESTER, Individually and as a Member of the Charlestown City Council; GEORGE ROBERTS, Individually and as a Member of the Pleasant Ridge Redevelopment Commission; CITY OF CHARLESTOWN, INDIANA, a Municipality; CHARLESTOWN BOARD OF PUBLIC WORKS AND SAFETY; CHARLESTOWN, INDIANA REDEVELOPMENT COMMISSION; PLEASANT RIDGE REDEVELOPMENT, LLC; NEACE VENTURES, LLC; NEACE ENTERPRISES, LLC; JOHN NEACE; and JOHN HAMPTON | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | DEFENDANTS |

## **AMENDED COMPLAINT**

Come now Plaintiffs, by counsel, and for their Amended Complaint state as follows:

<u>INTRODUCTION</u>

1.      This is a Complaint for deprivation of civil rights and conspiracy under 42 USC § 1983 and 42 USC § 1985(3) and a civil Complaint for racketeering under 18 USC § 1964 against the Defendants for a scheme of extortion to coerce Plaintiffs, under threat of imposition of several million dollars in municipal fines, to sell over one hundred (100) parcels of rental property for exactly $10,000 apiece to a private company, Pleasant Ridge Redevelopment, LLC, owned by a private individual, John Neace.

2.      The individual Defendants who are officers or employees of the City of Charlestown ("City Defendants") are sued both in their individual and official capacities.

3.      The City Defendants are sued as a result of the individual Defendants' actions within the course and scope of their authority, as caused by and/or ratified by the City of Charlestown and Charlestown Board of Public Works and Safety.

4.      The non-City Defendants, John Neace and John Hampton, are sued for conspiracy under 42 USC §§ 1983 and 1985(3) and for racketeering under 18 USC § 1964, as well as for claims under Indiana state tort law.

5.      The unlawful fining scheme that gives rise to Plaintiffs' claims for damages under 42 USC § 1983 and 1985 for equal protection violations and under 18 USC § 1964 for racketeering claims is already the subject of a preliminary injunction against the City of Charlestown in a case filed in the Clark Circuit Court as Case No. 10C02-1701-CT-10 ("Injunction Case"), with the Hon. Jason Mount of Scott County, Indiana assigned as Special Judge.

6.      None of the Plaintiffs to this case are parties to the Injunction Case.  However, the City of Charlestown and the Charlestown Board of Public Works and Safety are Defendants in that case.

7.      On December 4, 2017, Judge Mount issued a preliminary injunction against the City of Charlestown and issued Findings of Fact and Conclusions of Law in favor of the Plaintiffs in that

case.  Specifically, Judge Mount found that the City of Charlestown had engaged in discriminatory enforcement of fines in an effort to force property owners (such as Plaintiffs here) to sell their rental properties to John Neace and his company, PRR.  Judge Mount further found that these actions violated the equal protection rights of the property owners of Pleasant Ridge, including the Plaintiffs here, under the Fourteenth Amendment to the United States Constitution.

8.      To the extent Judge Mount has issued findings of fact and conclusions of law pertinent to this case, Defendants City of Charlestown, Charlestown Board of Public Works and Safety, and the other City Defendants are estopped under principles of collateral estoppel/issue preclusion from contesting these findings of fact and conclusions of law.

## PARTIES

9.      Plaintiff F & J APARTMENTS, LLC ("F&J") is an Indiana limited liability company with a principal business address in Clark County, Indiana, and is owned by James L. Woods, a resident of Clark County, Indiana.

10.     Plaintiff BROWN RENTAL PROPERTIES, LLC ("Brown") is an Indiana limited liability company with a principal business address in Clark County, Indiana, and is owned by Thomas J. Brown, a resident of Clark County, Indiana.

11.     Plaintiff COOLEY PROPERTY MANAGEMENT, LLC ("Cooley") is an Indiana limited liability company with a principal business address in Floyd County, Indiana, and is owned by Steven Cooley and Heather Cooley, residents of Floyd County, Indiana.

12.     Plaintiff GREGORY DEVELOPMENT, LLC ("Gregory Development") is an Indiana limited liability company with a principal business address in Clark County, Indiana, and is owned by Josh Gregory, a resident of Clark County, Indiana.

13.     Plaintiff JOSH GREGORY is a resident of Clark County, Indiana, and is the owner of Gregory Development.

14.     Plaintiff GREGORY YEAGER is a resident of Clark County, Indiana.

15.     Plaintiff MATTHEW SHULTZ and LISA SHULTZ are husband and wife and are residents of Clark County, Indiana.

16.     Plaintiff KENNETH T. WESTMORELAND, JR. and MICHELLE R. WESTMORELAND are husband and wife and are residents of Jefferson County, Kentucky.

17.     Plaintiff DALE MAY is a resident of Clark County, Indiana.

18.     Defendant G. ROBERT HALL is a resident of Clark County, Indiana and was at all times acting in his capacity as Mayor of the City of Charlestown and was acting under the color of state law.  He is sued in his individual and official capacity as  an elected official of the City of Charlestown.

19.     Defendant M. ANTHONY JACKSON is a resident of Washington County, Indiana and was at all times acting in his capacity as Building Commissioner for the City of Charlestown and was acting under the color of state law.  He is sued in his individual and official capacity as  an employee of the City of Charlestown.

20.     Defendant ERIC VAUGHN is a resident of Clark County, Indiana and was at all times acting in his capacity as a member of the City Council of the City of Charlestown and was acting under the color of state law.  He is sued in his individual and official capacity as  an elected official of the City of Charlestown.

21.     Defendant TED LITTLE is a resident of Clark County, Indiana and was at all times acting in his capacity as member of the City Council of the City of Charlestown and was acting under the color of state law.  He is sued in his individual and official capacity as  an elected official of the City of Charlestown.

22.     Defendant MIKE VAUGHN is a resident of Clark County, Indiana and was at all times acting in his capacity as a member of the City Council of the City of Charlestown and was acting under the color of state law.  He is sued in his individual and official capacity as  an elected official of the City of Charlestown.

23.     Defendant BRIAN HESTER is a resident of Clark County, Indiana and was at all times acting in his capacity as member of the City Council of the City of Charlestown and was acting under the color of state law.  He is sued in his individual and official capacity as  an elected official of the City of Charlestown.

24.     Defendant GEORGE ROBERTS is a resident of Clark County, Indiana and was at all times acting in his capacity as member of the Charlestown Redevelopment Commission and was acting under the color of state law.  He is sued in his individual and official capacity as  an official of the City of Charlestown.

25.     Defendant CITY OF CHARLESTOWN, INDIANA, is a political subdivision of the State of Indiana.

26.     Defendant CHARLESTOWN BOARD OF PUBLIC WORKS AND SAFETY is a department of the City of Charlestown.

27.     Defendant CHARLESTOWN, INDIANA REDEVELOPMENT COMMISSION is the governing body of the Charlestown, Indiana Department of Redevelopment, a department of the City of Charlestown.

28.     Defendant JOHN NEACE is a private citizen and is a resident of Floyd County, Indiana.

29.     Defendant JOHN HAMPTON is a private citizen and is a resident of Jefferson County, Kentucky.

30.     Defendant PLEASANT RIDGE REDEVELOPMENT, LLC ("PRR") is an Indiana limited liability company engaged in interstate commerce.  It is owned by John Neace and operated by John Hampton.

31.     Defendant NEACE VENTURES, LLC ("Neace Ventures") is the assumed name of Neace Ventures Kentucky, LLC a Kentucky limited liability company owned by John Neace.

32.     Defendant NEACE ENTERPRISES, LLC ("Neace Enterprises") is a Kentucky Limited Liability Company owned by John Neace.


JURISDICTION AND VENUE

33.     This action is brought against the Defendants pursuant to 42 USC § 1983 and 42 USC § 1985(3) for deprivation of civil rights and conspiring to deprive Plaintiffs' rights under the equal protection clause of the Fourteenth Amendments to the United States Constitution and pursuant to the civil remedies available under 18 USC § 1964 of the Racketeer Influenced and Corrupt Organizations Act ("RICO") for pattern of racketeering activity involving "extortion" prohibited by the Hobbs Act, 18 USC § 1951.

34.     Jurisdiction is founded upon 28 USC § 1331, 1343(a)(1) and 1367(a).

35.     Venue is proper in this Court pursuant to 28 USC § 1391 in that all Defendants other than John Hampton reside in this District and all events which give rise to this action occurred within this District.


FACTS COMMON TO ALL COUNTS

The Pleasant Ridge Neighborhood

36.     Pleasant Ridge is a neighborhood within the City of Charlestown. The residents are primarily people of modest means.

37.     The neighborhood originated during World War II when the Army constructed housing for personnel at a since-abandoned munitions factory in Charlestown. The Gunnison Housing Corporation built the Pleasant Ridge homes at its factory in New Albany, Indiana and then assembled the components onsite. The primary original layout in Pleasant Ridge was a 1,250 square-foot duplex. Many of the properties remain duplexes, while others have been consolidated into single-family units.

38.     Over the years, many of the Pleasant Ridge properties became rental units. In recent years, approximately sixty to seventy percent of the residents were low-income renters.

39.     Pleasant Ridge provides affordable housing in Charlestown, whether from the perspective of a renter or a home buyer. It would be difficult if not impossible to rent or buy a home in Charlestown outside of Pleasant Ridge for the same prices that are available within Pleasant Ridge.

40.     It would be difficult if not impossible for Plaintiffs' tenants to purchase homes elsewhere with the same space and amenities that their Pleasant Ridge rental homes have.

41.     Defendant City believes that Pleasant Ridge is in dire need of redevelopment.

42.     At a hearing on the preliminary injunction in the Injunction Case, Mayor Hall testified that Pleasant Ridge consumes a disproportionate share of city resources. City Inspector Michael Anthony Jackson testified that, due to the materials and methods of construction, the Gunnison homes were only ever intended to be temporary.


<u>The 2014 Effort at Redevelopment</u>

43.     In 2014, the City applied to the State of Indiana for a multi-million-dollar grant under the State's Blight Elimination Program ("BEP"). According to the City's BEP application, the redevelopment plan for Pleasant Ridge involved "the demolition of 354 homes," which represents every home in the neighborhood, including the rental properties owned by Plaintiffs.

44.     For the BEP application, the City partnered with a property developer called Neace Ventures and/or Neace Enterprises.

45.     Both Neace Ventures and Neace Enterprises are Kentucky limited liability companies engaged in interstate commerce and owned by John Neace.

46.     In November 2014, the Charlestown City Council voted down the plan to redevelop Pleasant Ridge. Charlestown did not receive any grant money under the Blight Elimination Program.

<u>The Latest Effort at Redevelopment</u>

47.     In November 2015, Mayor Hall stood for reelection. A major issue was the redevelopment of Pleasant Ridge. Mayor Hall and his slate of allied candidates for City Council seats won their elections, with the exception of George Roberts.  Mr. Roberts was defeated by Tina Barnes.

48.     In that same election, Tina Barnes won election to the City Council as an opponent of wholesale redevelopment in Pleasant Ridge. Ms. Barnes has consistently voted against ordinances and resolutions that she believes target Pleasant Ridge for destruction.

49.     In early 2016, the City Council, under Mayor Hall's leadership, and the City of Charlestown Redevelopment Commission, of which Mayor Hall is the president, began laying the groundwork for the next attempt to redevelop Pleasant Ridge.

50.     On January 18, 2016, the City Council passed Resolution 2016-R-I, which is entitled "A Resolution Authorizing Action to Develop and Implement Plans for Improvement of Conditions in the Pleasant Ridge Subdivision." Resolution 2016-R-I declared Pleasant Ridge to be an "area needing redevelopment" under Indiana's redevelopment statutes, Ind. Code. 36-71-3, et seq. Ms. Barnes was the sole City Council vote against Resolution 2016-R-I.

51.     On February 1, 2016, the City enacted Ordinance 2016-0R-2, which established "An Inspection Program for At-Risk Residential Properties in the City of Charlestown, Indiana." Barnes was the sole City Council member to vote against the rental-inspection ordinance.

52.     On February 15, 2016, the City enacted Ordinance 2016-0R-7, which is entitled "An Ordinance Prohibiting Public Nuisances." Ms. Barnes was the sole City Council member to vote against the public-nuisance ordinance.

53.     On October 27, 2016, the Redevelopment Commission passed Resolution 2016R-6, which declared Pleasant Ridge to be an area in need of redevelopment under Indiana's redevelopment statutes, Ind. Code. 36-7-1-3, et seq. Redevelopment Commission Resolution 2016-R-6 also approved a redevelopment plan for Pleasant Ridge.

54.     On November 7, 2016, the City Planning Commission passed Resolution 2016-R3, which approved Redevelopment Commission Resolution 2016-R-6 declaring Pleasant Ridge to be an area in need of development and adopting the Redevelopment Commission's plan for redevelopment.

55.     On November 7, 2016, the City Council passed Resolution 2016-R-13, which approved Redevelopment Commission Resolution 2016-R-6 declaring Pleasant Ridge to be an area in need of redevelopment and adopting the Redevelopment Commission's plan for redevelopment. Ms. Barnes was the sole City Council member to vote against the Resolution.

56.     In November 2016, the Redevelopment Commission passed Redevelopment Commission Resolution 2016-R-8, which called for all City boards, commissions, and councils to follow a policy in which fines levied for violations of the City's property-maintenance code are never waived.

57.     On December 8, 2016, the Redevelopment Commission passed Resolution 2016-R-9, which confirmed Redevelopment Commission Resolution 2016-R-6 declaring Pleasant Ridge to be an area in need of redevelopment and adopting the plan for redevelopment.

Coordination with Neace and Enforcement of the Property-Maintenance Code

58.     The City's relationship with developer John Neace did not end with the demise of the 2014 BEP application and the original plan to redevelop Pleasant Ridge in partnership with Neace Ventures/Neace Enterprises.

59.     On January 25, 2016, one week after the City Council passed Resolution 2016-R1 declaring Pleasant Ridge to be an area in need of redevelopment, Mayor Hall emailed John Neace to tell him that "We are having landlords calling wanting to sell their properties, because they know code enforcement is coming June 1st."

60.     The Mayor intended his January 25, 2016 email to alert Mr. Neace to the possible opportunity to buy large numbers of properties in Pleasant Ridge from landlords who owned multiple units. At that time, a small handful of landlords owned dozens of Pleasant Ridge properties. The Mayor anticipated that the plan to enforce the 2008 property-maintenance code against Pleasant Ridge properties, as set forth in City Council Resolution 2016-R-OI, would impose such steep fines on the owners of the Pleasant Ridge properties that they would be willing to sell to a developer such as Mr. Neace for demolition.

61.     At the hearing in the Injunction Case, the Mayor could not recall sending an email to any other developer besides Mr. Neace alerting him or her to property-acquisition opportunities in Pleasant Ridge that the City' s declared plan of code enforcement might create. There are no such emails in the record of that case.

62.     The Mayor wrote Mr. Neace again on April 8, 2016, asking for Mr. Neace's input on Pleasant Ridge redevelopment, and noting that the Mayor gets "very nervous because I don't like making decisions that ultimately affects your money and the success of this project." By "this project," the Mayor was referring to the redevelopment of Pleasant Ridge.

63.     At the hearing in the Injunction Case, the Mayor could not recall sending an email to any other developer besides Mr. Neace asserting that the Mayor was personally nervous because he was making decisions that affected the developer's money and the success of Pleasant Ridge redevelopment. There are no such emails in the record of the Injunction Case.

64.     On June 2, 2016, the Mayor wrote Mr. Neace again, this time notifying him that the City had sent letters to Pleasant Ridge landlords announcing that rental inspections would soon begin. The Mayor attached a copy of this letter to the email to Mr. Neace. As with his January 25, 2016 email, the Mayor was alerting Mr. Neace to the fact that the inspections of Pleasant Ridge rental properties for compliance with the property-maintenance code would soon result in buying opportunities for Mr. Neace.

65.     At the hearing in the Injunction Case, the Mayor could not recall sending an email to any other developer notifying him or her that the City had sent letters to Pleasant Ridge landlords announcing that rental inspections would soon begin. There are no such emails in the record of that case.

66.     On June 13, 2016, Mr. Neace, through his agent John Hampton, created a new limited liability company called Pleasant Ridge Redevelopment, LLC ("PRR").

67.     According to an email that Mr. Hampton sent Mr. Neace on July 6, 2016, the Mayor, the City Attorney, and Mr. Hampton met to discuss the redevelopment of Pleasant Ridge. That discussion included speculation that 30-40 property owners would refuse to sell and that eminent domain would eventually be required.

68.     The Mayor, City Attorney, Mr. Hampton, and Mr. Neace formulated a plan to depress property values by boarding up homes, thereby allowing the City to acquire any "hold outs" through eminent domain at a discounted price.

<u>Inspections and Fines in Pleasant Ridge and Continued Coordination with Neace</u>

69.     In August 2016, City Inspector Michael Anthony Jackson began inspecting Pleasant

Ridge rental properties pursuant to City Resolution 2016-R-I and the new rental inspection ordinance.

Mr. Jackson inspected exteriors and interiors for violations of the City's 2008 property-maintenance

code. The City has a policy and practice of issuing fines against Pleasant Ridge property owners

where properties are fined immediately from the date of a citation.

70.     The City has a policy and practice of issuing fines against Pleasant Ridge property

owners where the fines accrue daily.

71.     The City has a policy and practice of issuing fines against Pleasant Ridge property

owners where the fines are for more than $2,500, once a few days of accruing fines have past.

72.     The citations that Mr. Jackson issued to Pleasant Ridge landlords beginning in August

2016 conformed to this policy and practice. The citations imposed a separate fine for each violation

that Mr. Jackson identified. Moreover, the citations did not allow for any grace period during which

landlords could make repairs without being fined. The fine for each violation was imposed

immediately and would accumulate on a daily basis. Collectively, the various fines assessed on each

property would add up to significant sums very quickly.

73.     For example, on August 29, 2016, City Inspector Jackson issued citations to landlord

Jimmy Woods (owner of Plaintiff F&J) based on Mr. Jackson's inspection of the exteriors of fourteen

rental properties that Mr. Woods then owned in Pleasant Ridge. The various fines on all of the

properties added up to $5,600 per day. Mr. Jackson did not mail the citations until August 31, 2016,

meaning that Mr. Woods already owed $16,800 in fines on the day that Mr. Jackson placed the notices

in the mail.

74.     Faced with these fines, the Plaintiffs in this case, constituting the large landlords in

Pleasant Ridge, elected to sell their properties to the newly created PRR, which paid $10,000 for each

one. Between September 2016 and September 2017, PRR has acquired roughly 150 properties in Pleasant Ridge, including over 100 properties from the Plaintiffs in this case.

75.    Under City policy and an agreement entered into between the City and PRR, PRR theoretically assumed responsibility for the daily accumulating fines. But the City's policy and its agreement with PRR also allows all fines to be waived if the property is demolished. Because PRR pledged to demolish its Pleasant Ridge properties at some point, the City did not collect on any of the fines against PRR. Most of these homes have not in fact been demolished and remain standing and unoccupied, creating a nuisance and health and safety hazard in and of themselves.

76.    Technically, PRR now owes the City many millions of dollars because it has not yet demolished its Pleasant Ridge properties. The $5,600 in daily fines against 14 of the 25 properties formerly owned by James L. Woods and Plaintiff F&J, for example, have now accumulated for over one year, meaning that the fines for just those 14 properties now exceed two million dollars.

77.    The agreement between PRR and the City was memorialized in an October 24, 2016 letter from Mr. Hampton to Mr. Jackson, acknowledging the City's policy of the waiver of fines for the Pleasant Ridge properties that PRR has acquired. As part of this agreement, PRR is required to update the City periodically about how many properties it owns and when they are slated to be demolished.

78.    Once PRR acquired a Pleasant Ridge property, the City did not, and presently does not require PRR to make any of the repairs that the citations identified. This is true even if tenants remained in the rental units, which hundreds did until roughly April 2017 when leases began to expire.

79.    After the tenants move out of properties PRR has acquired, PRR boards many of them up.

80.     New problems have arisen at many PRR properties since they were boarded up, including the presence of vermin, garbage, and tall grass. Ellen Keith, a Plaintiff in the Injunction Case, and other Pleasant Ridge residents have complained to the City about these problems. But after the City failed to have PRR correct the problems, the neighborhood residents contacted the Clark County Health Department. The Health Department subsequently inspected several PRR properties and tried to work to have both the City and PRR address their problems.

81.     The City has not issued any citations against any PRR properties since PRR  acquired them, despite the complaints about vermin, garbage, and tall grass.

82.     As recently as September 2017, some of the properties owned by PRR were still occupied by renters.

83.     On November 8, 2016, Mayor Hall texted John Neace, Brigadier General Larry Lunt, and John Hampton (the head of PRR). Brigadier General Lunt is a part owner of PRR, and Mayor Hall introduced him to John Neace in August 2016. In this text, Mayor Hall wrote "Great News. The city council voted to pass the pleasant ridge redevelopment plan last night."

84.     At the hearing in the Injunction Case Mayor Hall did not recall writing any other developer to report that it was great news that the redevelopment plan passed, and the record in the Injunction Case contains no evidence of such communications.

85.     Although there was no written redevelopment agreement between the City and PRR throughout the process of fines and property acquisition in Pleasant Ridge, the City and Mr. Neace entered a formal development agreement in 2017 regarding a project called Springville Manor. This project is located in Charlestown, but outside of Pleasant Ridge. On March 15, 2017, Springville Manor LLC was formed, with John Hampton as the registered agent. Springville Manor is a real-estate development currently under construction with 32 small homes. The public materials for Springville Manor indicate that it is also owned by John Neace. In the Injunction Case, the Mayor

testified in the Injunction Case that one purpose of Springville Manor is to provide a relocation option for senior citizens living in Pleasant Ridge.

86.     To fund the Pleasant Ridge redevelopment project, the City of Charlestown has entered into a contract with Indiana American Water Company to sell the City's water utility for $13.4 million.

87.     In testimony before the Indiana Utility Regulatory Commission regarding the sale of the City's water utility, Mayor Hall testified that the City was planning to use City funds to offer low interest, forgivable loans to residents of Pleasant Ridge to subsidize those residents' purchase of homes in Springville Manor from John Neace.  In doing so, the City is subsidizing John Neace's efforts to sell new homes to low income residents who have been displaced by the forced sale of their existing homes in Pleasant Ridge.

88.     In testimony before the Indiana Utility Regulatory Commission, Mayor Hall also testified that at all times relevant to this case he, Mr. Jackson, and the individual members of the City Council were acting in their official capacity and, therefore, under color of law.

<u>Interactions with Plaintiffs</u>

89.     Prior to the implantation of the fining scheme, Plaintiffs were informed by city officials including Mayor Hall and Building Commissioner Jackson that increased fines were coming but that fines would be waived if Plaintiffs sold their properties to John Neace or his company, PRR.

90.     John Neace and his company, PRR, refused to negotiate on price and would not pay more than $10,000 per property, regardless of value.

91.     Because the amounts of fines imposed and/or threatened exceeded the value of the properties, all Plaintiffs ultimately were forced to sell to Neace.

92.     No other purchasers were interested in the properties due to the existing fines.

93.     Several Plaintiffs were told by Mayor Hall, personally, that they could avoid fines by selling their properties to John Neace.  Mayor Hall actively participated in facilitating the sales of these properties to Neace, and explicitly accommodated Plaintiffs who were willing to sell to Neace. By way of example, the following Facebook Messenger exchange took place between Heather Cooley and Mayor Hall in May of 2016:

> 05/03/2016 9:56 a.m.
> Cooley: Mayor Hall, We were able to reach a verbal agreement with Mr[.] Neace today. We are expecting to receive paperwork from his attorney in the next week or two. Just wanted to give you a heads up on our agreement. Happy Election Day! Thanks, The Cooleys
>
> 05/03/2016 12:05 p.m.
> Hall:   I am happy for you guys if it works for you.
>
> Cooley:  It's obviously not the amount we had originally hoped for, but if it removes us from the liability of the fines from the ordinance, then we are happy to walk away
>
> 05/21/2016 11:39 p.m.
> Cooley: Mayor Hall- Steve and I verbally came to an agreement with John Neace several weeks ago. We haven't gotten anything in writing from his attorney yet. I realize June 1st is just around the corner. After reading the ordinance, Steve and I understand that we must register all of our properties. However, this is going to be costly for us. Is it necessary for us to register them if our intent is to sell? We want to comply, but also want to spend as little money as possible given the amount that we will be selling them for...please advise. Thanks, Heather and Steve Cooley
>
> 05/22/2016 9:29 a.m.
> Hall:   . . . You should hear from him in the next week or so. **Relax we know you are trying to sale** [sic].

(Emphasis added.)

94.     The Mayor's coordination with Neace and Hampton was further memorialized in a memo from Hampton to Neace in June of 2016 regarding the forced sale from Cooley.  This document, which was obtained in discovery during the Pleasant Ridge Injunction Case and admitted, without objection, as an exhibit in that case, stated:

> Talked to Steve Cooley around noon on 5/27/16. He is very much on board with the Mayor's plan and knows that at $10,000 per lot he will have lost money on his investment but appears

willing to do so. He was told after he sold that he could continue to collect the rents and I told him I had heard that and was in agreement as long as we could legally arrange for him to remain liable in case of an incident on a property and not our entity. He said he has paid for insurance for several more months. Personally I'm not sure how we could totally protect ourselves from liability if handed that way.

*       *       *

Steve called around 4pm on Wednesday 6/8/16 and asked if we could close before 6/31 or find out if a seller to us could avoid paying the registration fees under the city's new rules. I called Mayor Hall and he is going to talk toe [sic] the enforcement agency.

95.     In June of 2016, Plaintiffs all received a letter from the City of Charlestown notifying them they needed to register all of their properties with the City of Charlestown or face daily fines of $1,500 per day.  The letter stated that all properties would be subject to random, periodic inspections by the city, and that "All Rental Properties will be required to be brought up to the standards set out in the Property Maintenance Code.  Each violation of the city's property maintenance code is considered a separate offense.  Each day any violation exists also constitutes a separate offense."

96.     In July of 2016, the City of Charlestown officially implemented its new fining scheme, resulting in millions of dollars in collective fines being imposed against Plaintiffs and their properties.

Properties Owned by Plaintiffs

97.     Beginning in May of 2016, Plaintiffs were pressured by City officials including the Mayor and Building Commissioner to sell their properties to Pleasant Ridge Redevelopment, owned John Neace.

98.     Prior to the events alleged in this Complaint, Plaintiff F&J Apartment Rentals, LLC ("F&J") (James L. Woods and Florina Woods, owners) owned numerous parcels of real estate in Pleasant Ridge, including 25 parcels at issue in this case.

99.     After receiving fines of $5,600 per day beginning in July of 2016 and being informed by the City that these fines would be waived if F&J sold its properties to John Neace, F&J sold those 25 properties to John Neace on September 29, 2016, for $10,000 apiece – a total of $250,000.

100.     From the date of receiving notice until the time of the sale to Neace approximately 3 months later, F&J had accrued municipal fines totaling approximately $500,000.

101.     Prior to the events alleged in this Complaint, Plaintiff Brown Rental Properties, LLC ("Brown") (Tom Brown, owner) owned numerous parcels of real estate in Pleasant Ridge, including 17 duplexes, 2 fourplexes, and one vacant lot which are at issue in this case.

102.     After receiving fines of $6,350.00 per day beginning on August 20, 2016, and being informed by the City that these fines would be waived if Brown sold its properties to John Neace, Brown sold those 17 duplexes and one vacant lot for $10,000 apiece and the 2 fourplexes for $20,000 apiece to John Neace – a total of $220,000 – on September 29, 2016.

103.     The total assessed value of the 20 properties sold by Brown, as determined by the Defendant City of Charlestown, was $591,600 in 2015.

104.     From the date of receiving notice until the time of the sale to Neace 41 days later, Brown had accrued municipal fines totaling $260,350.

105.     Prior to the events alleged in this Complaint, Plaintiff Cooley Property Management, LLC ("Cooley") (Steven Cooley and Heather Cooley, owners) owned numerous parcels of real estate in Pleasant Ridge, including 22 parcels at issue in this case.

106.     After receiving warning of impending fines, receiving notice from the City Building Commission that their properties were scheduled for inspection, and being informed by the City that no fines would be imposed if Cooley sold its properties to John Neace, Cooley sold all 22 properties to John Neace for $10,000 apiece – a total of $220,000.

107.    The total assessed value of the 22 properties sold by Cooley, as determined by the Defendant City of Charlestown, was $522,300 in 2015.

108.    Prior to the events alleged in this Complaint, Josh Gregory and/or Gregory Development owned numerous parcels of real estate in Pleasant Ridge, including 11 rental properties and one vacant lot at issue here.

109.    After receiving warning of impending fines, receiving notice from the City Building Commission that his properties were scheduled for inspection, and being informed by the City that no fines would be imposed if Mr. Gregory sold his properties to John Neace, Josh Gregory and Gregory Development sold 12 properties to John Neace.  Neace paid $10,000 apiece for 11 of the properties and $5,000 for one additional property – a total purchase price of $115,000 – on October 12, 2016.

110.    The total assessed value of the 12 properties sold by Josh Gregory, as determined by the Defendant City of Charlestown, was $351,400 in 2016.

111.    Prior to the events alleged in this Complaint, Plaintiff Yeager  owned numerous parcels of real estate in Pleasant Ridge, including 7 parcels at issue in this case.

112.    After receiving warning of impending fines, receiving notice from the City Building Commission that his properties were scheduled for inspection, and being informed by the City that no fines would be imposed if Yeager sold his properties to John Neace, Yeager sold those 7 properties to John Neace for $10,000 apiece – a total of $70,000.

113.    Prior to the events alleged in this Complaint, Plaintiffs Kenneth and Michelle Westmoreland ("the Westmorelands") owned numerous parcels of real estate in Pleasant Ridge, including 17 parcels at issue in this case.

114.    After receiving fines in an unknown sum and being informed by the City that these fines would be waived if the Westmorelands sold their properties to John Neace, the Westmorelands

sold these 16 properties to John Neace for $10,000 apiece and a 17th property (a 4-plex) for $20,000 – a total of $180,000.

115.    The total assessed value of the 17 properties sold by the Westmorelands, as determined by the Defendant City of Charlestown, was $471,300 in 2015.

116.    Prior to the events alleged in this Complaint, Plaintiffs Matthew Shultz and Lisa Shultz, owned numerous parcels of real estate in Pleasant Ridge, including 7 parcels at issue in this case.

117.    After receiving warning of impending fines, receiving notice from the City Building Commission that their properties were scheduled for inspection, and being informed by the City that no fines would be imposed if Shultzes sold to John Neace, the Shultzes sold 6 of their properties to Neace for $10,000 apiece- a total of $60,000.

118.    Prior to the events alleged in this Complaint, Plaintiff May  owned numerous parcels of real estate in Pleasant Ridge, including 6 parcels at issue in this case.

119.    After receiving warning of impending fines, receiving notice from the City Building Commission that his properties would be scheduled for inspection, and being informed by the City that no fines would be imposed if Yeager sold his properties to John Neace, May sold those 6 properties to John Neace for $10,000 apiece – a total of $60,000.


120.    The fair market values of Plaintiffs' properties at the time Plaintiffs were forced to sell for $10,000 apiece under threat of millions of dollars in municipal fines have not yet been determined.

## CAUSES OF ACTION

### Count 1: 42 USC § 1983 Claim for Violation of
### Equal Protection Clause of the Fourteenth Amendment

For Count 1 of their Complaint against all defendants, Plaintiffs state:

121.    Plaintiffs incorporate by reference the preceding paragraphs as if fully re-stated herein.

122.    The City cannot treat people or classes of people differently unless the differential treatment is reasonably related to the inherent differences between the differently treated people or classes. Any preferential treatment must be uniformly applicable and equally available to all people similarly situated.

123.    Here, the City treated Plaintiffs differently from Pleasant Ridge Redevelopment LLC (owned by John Neace and operated by John Hampton) without a reasonable relationship to any inherent difference between them.

124.    At the time relevant to this Complaint, Plaintiffs were a class of property owners who did not wish to sell or demolish their properties which were being rented to tenants. They are similarly situated to the Developers because both the Developers and the Plaintiffs owned properties that were occupied after the City implemented its heightened enforcement in 2016 and for several months after the increased fines were commenced.  However, the Plaintiffs were fined or threatened with fines while the Developers were not.

125.    The City has denied Plaintiffs the equal protection of the law, as guaranteed by the Fourteenth Amendment to the United States Constitution, by discriminating against them in favor of a private developer, PRR, owned by John Neace and operated by John Hampton.

126.    As a result of the City Defendants' conduct, Plaintiffs were damaged in amounts to be determined.

<u>Count 2: 42 USC § 1985(3) Claim for Conspiracy to</u>
<u>Deprive Plaintiffs of Equal Protection Under Fourteenth Amendment</u>

For Count 2 of their Complaint against all Defendants, Plaintiffs state:

127.    Plaintiffs incorporate by reference the preceding paragraphs as if fully re-stated herein.

128.    By the above described conduct, Defendants JOHN NEACE, JOHN HAMPTON,

PLEASANT RIDGE REDEVELOPMENT, LLC, AND NEACE VENTURES, LLC conspired with

the City Defendants "for the purpose of depriving, either directly or indirectly," Plaintiffs "of the

equal protection of the laws[.]" 42 U.S.C.A. § 1985

129.    As a result of the City Defendants' conduct, Plaintiffs were damaged in amounts to be

determined.


<u>Count 3: 18 USC § 1964 Civil Claim for Racketeering for</u>
<u>Conspiracy to Violate 18 USC § 1952 ("Hobbs Act")</u>

For Count 3 of their Complaint against all Defendants, Plaintiffs state:

130.    Plaintiffs incorporate by reference the preceding paragraphs as if fully re-stated herein.

131.    The Federal Hobbs Act is an anti-corruption statute which states, in part:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any
article or commodity in commerce, by . . . extortion or attempts or conspires so to do . . . shall
be fined under this title or imprisoned not more than twenty years, or both.

18 USC § 1951.

132.    The Hobbs Act defines "extortion" as follows:

The term "extortion" means the obtaining of property from another, with his consent, induced
by wrongful use of actual or threatened force, violence, or fear, **or under color of official
right**.

*Id*. (emphasis added).

133.    A Hobbs Act violation does not require any threat of physical violence.  Rather, it is sufficient that a public official used his or her office to coerce someone to willingly part with his or her property.  Stated another way,

> In a Hobbs Act prosecution of a public official, the government need not prove actual or threatened force, violence or duress because "[t]he coercive element is supplied by the existence of the public office itself." *United States v. Williams*, 621 F.2d 123, 124 (5th Cir.1980), cert. denied, 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981).3 Therefore, the government is required to prove only two things: (1) that a public official obtained property from another in exchange for performance or nonperformance of his official duties; and (2) that this extortionate activity affected interstate commerce.

*United States v. Adair*, 951 F.2d 316, 318 (11th Cir. 1992).  See also, *United States v. Tomblin*, 46 F.3d 1369, 1383 (5th Cir. 1995).

134.    Developers and City officials conspired to force low income residents of Pleasant Ridge out of their homes and to force Plaintiffs to sell those homes using newly-increased fines.  The Developers would buy the properties at a steeply discounted price of $10,000 and the City would then waive the fines; **no fines were imposed on the Developer for the same violations**.  The City planned to then acquire any remaining properties through eminent domain, and the entire area would be redeveloped, using City funds paid to the Developers.

135.    This conspiracy is shown by the following evidence which was admitted into the record of the Injunction Case:

a.    In an email from the Charlestown Mayor to the Developers on April 8, 2016 – at least three (3) months before Pleasant Ridge property owners were notified of the newly increased fines – the Mayor wrote:

> A lot is happening right now in order to put a successful project together for Pleasant Ridge.  There is [sic] certain legal things that have to be done on the City's part to be able to condemn and blight the area.  When this is completed (goal is in June) 90% of the legal work is complete.  Once the area is declared blighted and condemned the PR [Pleasant Ridge] folks only have 10 days to appeal it.  If a [sic] appeal happens the Judge can only rule on if the area meets statutory requirements.  That is a slam dunk.

b.  In that same email, the Mayor then complained that he was having trouble reaching the

Developer, John Neace, and stated:

>   That makes me very nervous because **I don't like making decisions that ultimately
>   affects your money and the success of this project**.

(Emphasis added.)

c.  On April 30, 2016, the Mayor then emailed the developer, John Neace, stating that

opposition by the residents of Pleasant Ridge seemed to be flagging, stating,

>   This last Thursday we invited the PR Assoc. and they gave no plans.  There were only
>   two people there in support of Pleasant Ridge.  They have lost most of their support.

The Mayor then concluded his email by encouraging the Developers to buy homes to set

prices for condemnation, stating, "Also try to purchase homes to establish comps."

d.  In a typed memo from John Hampton to John Hall regarding his interactions with the

Mayor of Charlestown beginning in May of 2016, Mr. Hampton stated that he and the

Mayor "talked about lots in Pleasant Ridge with delinquent taxes that might be able to be

purchased for the tax amount and he [the Mayor] will have Dave Reinhart, the City Tax

Collector, get us a list."

e.  In that same memo, Mr. Hampton also stated the following about his meeting with the City

Building Inspector:

>   Tony Jackson (tony.jackson@cityofcharlestown.com) . . . with the City of Charlestown
>   brought me a set of 1941 original blue prints of Pleasant Grove [sic] which includes a
>   topographical map and utility and sewer layout.  I will get copies made for us.  **Tony is
>   the person that will enforce the new requirements to get the existing homes up to
>   code**.

(Emphasis added.)

f.  In that same memo, Mr. Hampton went on to state the following regarding the Mayor:

>   Bob needs a plan from us with estimated costs so he can determine what the city can do
>   for us financially.

On vacant lots the city will acquire he said we can do a "Wrap Around Agreement" to be sure we have the right to buy the lots from the city.  I am not sure what that is.

\*       \*       \*

On June 29th I texted Bob the following" I hope yu [sic] are enjoying your vacation

John Neace reminded this morning that you were going to get some form of a subordination agreement indemnifying us from a law suit is (IF) such a suit was filed against us or the city for what we are trying to do at Plessant (sic) Ridge. We'd like to have that in place before we start closing on lots if possible.

He replied the following on Tuesday, July 5yth [sic]

John, the letter we talked about before was paret [sic] of the blight eliminationprogram [sic] that formalized a partnership.  It is important to note that the city is not involved in these private transaction. We would be glad to discuss this with you and our attorney if you desire.

g.  Handwritten notes of the Developers from a meeting with the Mayor and the City Attorney, Michael Gillenwater, included the following outline of the plan between the Mayor and the Developers to utilize eminent domain by the city to acquire any holdouts at lower prices:

**"Plan"**

**Our purchases establish values**

**Board up homes will lower values**

**Trying to postpone date to use eminent domain**

\*       \*       \*

**Until the city "adopts" a redevelopment plan can't do agreement to indemnify us.**

**Only limited things they can challenge city with "public purpose"**

h.  In an email from John Hampton to John Neace, in which Mr. Hampton discusses this same meeting with Mayor Hall, he explains the scheme in detail.  Specifically, Mr. Hampton stated the following about his meeting with Mayor Hall and the City Attorney, Michael Gillenwater:

Regarding the indemnity agreement, I talked to Bob and also for a half hour after I left Bob's office with the city's attorney Michael Gillenwater. **Bob says for all of this to work properly for the condemnation of homes we need to remain independent of the city** as we are right now considered a private developer with no contractual relationship with the city which is 100% factual. **Once the city starts condemnation proceedings, no purchases from that date forward can be used to determine value, only purchases prior to that point which are all arms length [sic] transaction between us and the owners and that is what sets the value for the condemnations**. The city only anticipate [sic] 20 to 40 holdouts [out of 350 homes] at that point. Michael said an agreement can't be entered into between us and the city without consideration from both parties and at this point, because we are not partners in anyway [sic] in the redevelopment, there is no consideration to be offered. **Once a development plan has received final approval we will become the approved developer and we would be able to enter into an indemnification agreement**. At that point the plan with us as developer would be in place **and then the city would commence condemnation proceedings against anyone remaining that has not agreed to sell**. Michael said there are only limited things someone can challenge anyway because what we are doing has a "public purpose".

(Emphasis added.)

i.  At the end of July/beginning of August, the City finally implemented its scheme of heavily

fining properties in Pleasant Ridge.  Prior to initiating the increased fining scheme, the

Mayor forwarded the Developer a letter he was sending to the Pleasant Ridge rental

property owners.  This letter to the landlords included the following:

In January 2, 2016, the Common Council of the city of Charlestown, Indiana, passed Resolution No. 2016-R-1, a *Resolution Authorizing Action Two Develop and Implement Plans For Improvement of Conditions In The Pleasant Ridge Subdivision*. That resolution directed the Mayor and Redevelopment Commission to develop plans for redeveloping Pleasant Ridge, in order to remediate the conditions that are causing it to be an area needing redevelopment.

Afterward, the Common Council enacted ordinance number 2016-OR-2, an *Ordinance Establishing An Inspection Program For At-Risk Residential Rental Properties In The City Of Charlestown, Indiana*.  That ordinance requires owners of certain rental properties to register of those properties with the City's Building Commissioner's office before July 1, 2016.  Failure to register rental properties by July 1, may result in penalties of up to $1500.00 per day for each day registration is neglected.

*        *        *

All Rental Properties will be required to be brought up to the standards set out in the *Property Maintenance Code*.  Each violation of the city's property maintenance code is considered a separate offense.  Each day any violation exists also constitutes a separate

offense.  Please understand that these same standards are being applied to owner-occupied homes.

Because it is anticipated that it may be economically unfeasible for many properties to be brought up to the standards set out in the city's *Property Maintenance Code*, some landowners may choose to remedy the problem by removal of the buildings, rather than spending the money required to bring structures up to code.  In that case, property owners should present a plan for removal of the building.  Until such buildings are removed, windows and doors should be promptly boarded up and the grass and exterior of the premises maintained.

136.    Testimony in the Injunction Case by the City's Building Commissioner, Defendant Jackson, provided examples of owners of homes in Pleasant Ridge being hit with large fines – some in excess of $1,000 per day, with fines accruing before the property owner was even served with notice. The following was one example:

Q    So isn't it true that the fines begin to run on September 26th but they were not delivered according to this, until October 4th?

A    that is correct.

Q    And so during that time, we have $600.00 dollars [sic] a day, I calculate that to be nine (9) days, by the time that this was delivered the Association had already received $5,400 dollars [sic] in fines.

A    Apparently that is correct Sir.

137.    Defendant Jackson further testified regarding another example involving one of Mr. Woods' properties:

Q    Do you see at the bottom that this was a determination was made on the 29th day of August, 2016?

A    Yes Sir.

Q    And that the fines started that day, the 29th day of August?

Q    Yes Sir.

Q    And they were daily fines in the amount of $350.00 dollars [sic]?

A    Yes Sir.

Q    And now flip back to the first page, looks like this was a cover letter [where] you sent all these a[t] once to Mr. Woods?

A   That is correct.

Q   And isn't it true that the cover letter is dated the 31st day of August, 2016?

A   Yes Sir if that is what it is stated, yeah.

Q   So just for that one (1) property [--] looks like there are many more in here for various amounts of fines [--] that property had three (3) days times $350.00 dollars [sic] already by the time you put it in the mail to Mr. Woods?

A   That is correct, yes.

(Injunction Case, Transcript of Hearing on September 1, 2017, pp. 126-27.)

138.    In contrast, these fines were not imposed or enforced against John Neace's company,

Pleasant Ridge Redevelopment, LLC, when it bought these properties from the suddenly embattled

property owners.  In testimony in the Injunction Case, Defendant Jackson admitted as much, as

follows:

Q   Isn't it true that you issued citations against other landlords for example Mr. Westmorland who is listed here?

A   I had, yes Sir.

Q   So, in the approximately two (2) months between August, late August and late October, this letter dated 2016, isn't it true that some of the properties owners to who you had issued order and fines sold their properties to Pleasant Ridge Redevelopment, LLC.

A   Yes that is apparent, they have.

Q   Now let's turn back to the letter, first page, can you look in the first paragraph second sentence it says, at your request this letter comes to confirm Pleasant Ridge redevelopment responsibility regarding those properties, and the tenants and the houses.  Do you confirm it says that?

                              *        *        *

A   Yes Sir.

Q   Okay now if you could review, don't read it out loud, just review the paragraphs that are numbered one (1) through six (6), these requirements.

A   Uh-huh.

**Q   Okay, now under those requirements once Pleasant Ridge Redevelopment [acquires] a property from a landlord with pending citations, did you require Pleasant Ridge Redevelopment to perform any of the repairs ordered in the citations?**

**A   No Sir.**

Q   And it is true that you did not require Pleasant Ridge Redevelopment to fix up these newly acquired properties pursuant to the citations even when tenants remained in them?

A   No Sir what I did when a, if I was given a request to have a, if there was a problem then I contacted the owners and have them fix it.  In this particular case these houses the list of these houses that went before the Board of Public Works and approved for demolition

Q   Right then people remained living in some of those homes for several months is that true?

A   Yes Sir.

**Q   And isn't it true that under paragraph four (4) of this letter it states that, any fines attached to the properties will no longer remain once the property is raised an removed?**

**A   That is correct.**

Q   [Now] based on the practice towards Pleasant Ridge Redevelopment, LLC if the Association had sold it property to Pleasant Ridge Redevelopment, LLC after you issued those citations against it you would not have required Pleasant Ridge Redevelopment, LLC to fix the property up in the way that the Association did fix the property up, isn't that true?

A   That would be up to the owner of the house.

Q   But you would have not required Pleasant Ridge Redevelopment to fix the property up, correct?

A    It is according to what the circumstances were, I believe?

Q   If Pleasant Ridge Redevelopment promised to eventually [raze] and remove the property you would have not forced them to fix the property up correct?

A   Oh I understand what you're saying yeah I'm sorry, ugh, yes.

**Q   And you would not have required Pleasant Ridge Redevelopment to fix up the Association's property in that case even if the Association's [tenants] remained there for a period of time.**

**A   That is correct.**

(Injunction Case, Transcript of Hearing on September 1, 2017, pp. 130-132 (emphasis added).)

139.    As these exchanges show, Plaintiffs were faced with a choice: either pay fines to the City totaling tens of thousands of dollars – or even hundreds of thousands of dollars, in some cases – or sell their homes to PRR, owned by John Neace.

140.    By the above described conduct, Defendants all conspired to use the City's fining authority to coerce property owners in Pleasant Ridge to hand over their homes to a private entity, the Developers.  This constitutes the "obtaining of property from another, with his consent . . . under color of official right."  The conduct referenced herein  is a violation of the Hobbs Act.

141.    Violations of the Hobbs Act constitute "racketeering activity" pursuant to 18 USC § 1961.

142.    Through Pleasant Ridge Redevelopment, Defendants Neace and Hampton have "receive[d] . . . income, directly or indirectly, from a pattern of racketeering activity" and have "use[d] or invest[ed] . . . part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."    18 USC § 1962.

143.    Defendant Jackson, the Building Commissioner, was paid by Neace and Hampton to perform asbestos removal and other work on the vacated properties in Pleasant Ridge, in exchange for his cooperation in the above described scheme.  As such, Jackson "receive[d] . . . income, directly or indirectly, from a pattern of racketeering activity" and has "use[d] or invest[ed] . . . part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."    18 USC § 1962.

144.    Defendants Hall, Vaughn, Little, Ledbetter, and Hester "receive[d] . . . income, directly or indirectly, from a pattern of racketeering activity" and have "use[d] or invest[ed] . . . part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."   18 USC § 1962.

145.    By way of example, Mayor Hall ("MH") and John Neace ("JN") had the following email exchange in February of 2015:

MH:    The 2015 campaign offers a complete change in the City Council.  We must change from a group who have personal agendas and who are stuck in the past to a new council who understands the need to look ahead for progress.

There are 7 people running on our team this election.  I as Mayor, Donna Coomer as Clerk Treasurer, for city council, Eric Vaughn, Ben Ledbetter, George Roberts, Ted Little, and Brian Hester.  All accomplished, well known people in the community, and would be new to the council.

**They were recruited and are all 100% committed to the redevelopment of Pleasant Ridge** and the community as a whole.  If you could support this group in winning it would be appreciated.

It will be expensive to get the full team elected and your financial help would make a difference.  Myself, Donna Coomer, and Eric Vaughn run city wide.  The other 4 run in their perpective [sic] districts.  City wide elections cost between 12-14K while district campaigns cost 3-4K.  Meaning the amount needed to raise will be 48-58K.

We would like to invite you to help in raising the needed funds to move Charlestown to a Brighter Future.

Bob

JN:    **How much can I contribute?**

MH:    **There are no limits in municipal races.**

(Emphasis added.)

146.    Defendants Hall, Vaughn, Little, Ledbetter, and Hester subsequently received campaign contributions from John Neace in 2015 in exchange for their support for the Pleasant Ridge

redevelopment, including a $10,000 contribution made by Neace on May 12, 2015, funneled through the Clark County Republican Party ("CCRP").

147.    Subsequent to this contribution, the CCRP paid these funds to the campaigns of Defendants Hall, Vaughn, Little, Ledbetter, and Hester.

148.    The CCRP reported no contributions to the campaigns of any other candidates for any other race in 2015.

149.    As a result of Defendants' conduct, Plaintiffs were damaged in amounts to be determined.

150.    Pleasant Ridge Redevelopment, Neace Ventures, Neace Enterprises, John Neace, and John Hampton are engaged in interstate commerce, by virtue of the following:

   a.   The conspiracy extends back to the 2014 attempt at redevelopment in which Neace
        Enterprises and/or Neace Ventures – both Kentucky-based companies – officially
        partnered with the City of Charlestown Indiana.

   b.   Pleasant Ridge Redevelopment and John Neace acquired properties located in Indiana
        from owners residing in both Indiana and Kentucky.

   c.   Under the conspiracy, as planned, Pleasant Ridge Redevelopment intends to utilize the
        real estate acquired from Plaintiffs to construct luxury homes using materials and labor
        provided in interstate commerce.

151.    Defendants are therefore liable to Plaintiffs for these damages pursuant to 18 USC § 1964.


### Count 4: State Tort Claims of Conspiracy, Conversion, and Abuse of Process

For Count 4 of their Complaint against JOHN NEACE and JOHN HAMPTON, Plaintiffs state:

152.    Plaintiffs incorporate by reference the preceding paragraphs as if fully re-stated herein.

153.    Under Indiana law, "A civil conspiracy is a combination of two or more persons who engage in a concerted action to accomplish an unlawful purpose or to accomplish some lawful

purpose by unlawful means." *Miller v. Cent. Indiana Cmty. Found., Inc.*, 11 N.E.3d 944, 962 (Ind. Ct. App. 2014).

154. By their conduct, Neace and Hampton conspired with City Defendants to wrongfully deprive Plaintiffs of both their real estate and of the value of the civil fines imposed under the City's building code.

155. This conspiracy involved the following illegal acts:

a. Conspiracy to deprive Plaintiffs of their civil rights under the Equal Protection Clause of the 14th Amendment to the United States Constitution;

b. Conspiracy to deprive Plaintiffs of their civil rights under the "Equal Privileges" clause of Indiana Constitution, Article 1,  Sec. 23;

c. Conspiracy for the tort of "abuse of process" – i.e., the City's fining scheme was a legal process that involved "(1) ulterior motive and (2) use of process that would not be proper in the normal prosecution of the case"; *Watters v. Dinn*, 633 N.E.2d 280, 288 (Ind. Ct. App. 1994); and

d. Conspiracy for the tort of "civil conversion."

156. As a result of Defendants' conduct, Plaintiffs were damaged in amounts to be determined.

WHEREFORE, Plaintiffs request judgment against the Defendants for their damages, for punitive damages, attorneys' fees, costs, and for all other appropriate relief according to the law.

Respectfully Submitted

/s/ J. David Agnew
Attorney No. 21531-49
LORCH NAVILLE WARD LLC
506 State Street – P.O. Box 1343
New Albany, IN 47151-1343
Telephone:  812.949.1000
Email:  dagnew@lnwlegal.com

Matthew J. Schad, #20762-22
George A. Budd, V, #24571-29
SCHAD & SCHAD, P.C.
223 East Spring Street
New Albany, IN  47150
(812) 945-4555
Email: mschad@schadlaw.com
Email: gbudd@schadlaw.com


Come now the Plaintiffs and request a trial by jury on all issues so triable.

/s/ J. David Agnew
Attorney No. 21531-49
LORCH NAVILLE WARD LLC
506 State Street – P.O. Box 1343
New Albany, IN 47151-1343
Telephone:  812.949.1000
Email:  dagnew@lnwlegal.com


Matthew J. Schad, #20762-22
George A. Budd, V, #24571-29
SCHAD & SCHAD, P.C.
223 East Spring Street
New Albany, IN  47150
(812) 945-4555
Email: mschad@schadlaw.com
Email: gbudd@schadlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2018, a copy of the foregoing Amended Complaint was filed electronically. Parties may access this filing through the Court's system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system:

James L. Fischer, Jr.
Jeffrey L. Hansford
Curtis P. Moutardier
BOEHL STOPHER & GRAVES, LLP
400 Pearl St., Suite 204
New Albany, IN 47150

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP
Bonterra Building, Suite 200
3620 Blackiston Blvd.
New Albany, IN 47150

/s/J. David Agnew
J. David Agnew